IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 16, 2020

**DELMAR L. MACK, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Washington County**
**No. 43472     Lisa Rice, Judge**

_____

**No. E2019-00273-CCA-R3-PC**

_____

Petitioner, Delmar L. Mack, Jr., appeals the Washington County Criminal Court's denial of his petition for post-conviction relief. Petitioner contends that his guilty pleas to attempted first degree murder, aggravated kidnapping, and aggravated assault were not knowingly, intelligently, and voluntarily entered because, at the time he entered his plea agreement, he was suffering from "severe mental distress and anxiety," resulting in an inability to understand the nature and details of the agreement. Following a thorough review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Caleb C. McDaniel, Elizabethton, Tennessee, for the appellant, Delmar Lamar Mack, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Ken C. Baldwin, District Attorney General, Pro-Tem; and Erin McCardle, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

*Guilty Plea Submission Hearing*

On February 8, 2017, Petitioner pled guilty to attempted first degree murder and aggravated kidnapping in Washington County case number 40457 and to aggravated

assault in Washington County case number 40672. Pursuant to a plea agreement, the trial court sentenced Petitioner, as a Range I standard offender, to concurrent terms of eighteen years with a thirty percent release eligibility for attempted first degree murder, eight years with a one hundred percent release eligibility for aggravated kidnapping, and three years with a thirty percent release eligibility for aggravated assault, for a total effective sentence of eighteen years' incarceration.[1]

The State provided the following factual basis for Petitioner's guilty pleas:

> In case number 40457, on that case on the date in question, . . . Ms. Mack at the time, was subjected to a continued beating by her husband. The proof would be that there was an instance that started earlier in the evening and continued on through the night, the culmination of the shooting in the bedroom. She would testify that she was kicked and hit or punched, she was drug to the basement of the house, was shot at in the basement, was drug back upstairs over a period of hours, and in the bedroom an AR rifle was placed on her hip and was shot, which injured her severely. She was in the hospital for approximately a month thereafter recovering. That would be the basis for the [Aggravated] Kidnapping would be the confinement, and the shooting for the Attempted First Degree Murder.
>
> . . . .
>
> In [case number 40672], between the dates of August of 2013, the two (2) days that are mentioned, that, again [Petitioner] . . . had kicked and hit [Ms. Mack] in the stomach and back area causing injuries that were -- that she could only see since they were covered by her clothing. She proceeded to heal from those injuries but they got to a point where she was feeling completely sick and having issues. At that point in time when [Petitioner] was out of town, she went to the hospital and received treatment. They did diagnose upon X-ray that she had a lacerated spleen in that case and that would be the basis for the Aggravated Assault[.]

During the plea colloquy, Petitioner confirmed that he was not under the influence of alcohol, drugs, or any mind-altering substance that would affect his ability to understand the proceedings. Petitioner agreed that trial counsel went over the contents of the plea form with him, and Petitioner indicated that he understood the form. The trial court advised Petitioner of the maximum and minimum penalties for each of the offenses to which

---

[1] Based on the plea agreement, the State dismissed charges of especially aggravated kidnapping and two counts of attempted aggravated rape in counts 2, 3, and 5 in case number 40457.

Petitioner was pleading guilty, and the court explained the agreed sentence for each offense. Petitioner told the trial court that he had no questions about the minimum and maximum punishment and fines that could be imposed. Petitioner indicated that he understood he had the right to enter a plea of not guilty and proceed to trial and that, by entering the plea agreement, he was waiving his right to trial. Petitioner agreed that, if he proceeded to trial, he had the right to confront witnesses against him, to present evidence in his defense, and to testify in his own behalf. Petitioner said that he understood he had a Fifth Amendment privilege against self-incrimination and the right to appeal if he was convicted at trial. Petitioner indicated that he was not threatened, coerced, or harassed regarding his plea and that he was entering a guilty plea to each offense freely and voluntarily. Petitioner affirmed that it was his decision to enter the plea agreement after "going over the options with [his] attorneys[.]" Petitioner agreed that, if the cases had gone to trial, the State could have produced witnesses to testify in accordance with the factual basis for the pleas provided by the State. Trial counsel explained, "I've discussed this with [Petitioner] as it relates to the stipulation. We would stipulate this would be the State's proof, not that we necessarily agree with each and every thing that was said, but just for the basis of the plea, he does stipulate that that would be State's proof at trial." The trial court found that the plea agreement was "appropriate" and, based on its colloquy with Petitioner, accepted the guilty pleas.

*Post-Conviction Proceedings*

On December 12, 2017, Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, Petitioner filed an amended petition. At an evidentiary hearing, Petitioner testified that he had served in the United States Air Force for seven years, from 1987 to 1995. Petitioner testified that he had a BS in "interdisciplinary studies" from ETSU, which included "humanities, legal studies, and information technologies[.]" He said that he was a "disabled veteran" with "chronic muscular problems and neurological muscle problems," as well as arthritis and "degenerated disk problems." Petitioner said that he also suffered from "chronic anxiety problems, chronic depression." He testified that he had been diagnosed with attention deficit disorder (ADD), which caused him to have problems retaining and comprehending information. Petitioner also claimed that he had been diagnosed as having bipolar disorder. Petitioner testified that he had received treatment for his various conditions from the VA Medical Center and Frontier Health. He said that he had been previously prescribed "Strattera, Wellbutrin, [and] Remeron" and that the VA had "given [him] Seroquel before." Regarding his "[a]nxiety problems[,]" Petitioner stated:

> [I]f I get . . . in a situation where I feel highly pressured, I may make erratic decisions basically due to mental anguish that press on me where I -- I want to flee the situation I'm in. And also, it also causes me physical pain

if I get highly -- in severe anxiety. I have [a] chronic pain situation that affects me where basically I'm not -- not to be able to think incoherently (sic). I just [--] the pain overwhelms me and I just want to leave the situation.

Petitioner said that, after retaining trial counsel, he primarily communicated with counsel by sending counsel letters. Petitioner explained that he wrote six or seven letters to trial counsel but claimed that trial counsel did not respond. He said that he addressed the issues concerning his mental health and the VA medical records in some of the letters. He also suggested to trial counsel that he raise "the issue of diminished capacity and the issue of *Miranda* warning that I didn't sign" as part of Petitioner's defense. In another letter, Petitioner suggested that trial counsel request a change of venue. Petitioner agreed that he discussed some of these concerns with trial counsel but said that the issues were not "appropriately addressed" and that trial counsel did not "ease [his] concerns." He explained that he reviewed discovery materials with trial counsel "a little bit" but that trial counsel did not review it to Petitioner's satisfaction. He said that they did not "go over everything . . . in detail[.]" He said that they reviewed some of the video of Petitioner's police interview but that they did not go over the whole two hours and did not review the 911 call in detail.

Regarding the plea agreement, Petitioner said that he was presented with the plea offer the day before he entered the plea agreement. Petitioner testified that trial counsel explained the agreement to him and that he "thought [he] understood some part of it." He testified that trial counsel tried to explain the judgment sheets but that he did not fully understand them. Petitioner stated, "I was feeling bat-sh** crazy." He said that he had been in jail for two years prior to his entering the plea agreement and that, while he was incarcerated, he was not receiving mental health treatment. Petitioner recalled that, before the plea submission hearing, he asked trial counsel if he could enter an *Alford* plea but that trial counsel informed him that such a plea "would not be a good thing in the eyes of the parole [board.]" Petitioner said that he thought it was in his best interest to accept the plea deal because "if [he] went to trial [he] didn't feel confident [trial counsel] would represent [him] to the point that [he] would get a fair trial."

On cross-examination, Petitioner stated that, prior to the offenses in February 2015, he was not receiving mental health treatment but that he "did talk to that mental health counselor . . . probably several months before." He agreed that the diagnostic impressions in his May 2014 VA records stated that he had "[u]nspecified anxiety disorder; alcohol use disorder, moderate." He agreed that he had declined "early intervention help" for mental health issues and that he had been taking no medication to address his anxiety prior to the February 2015 offenses.

- 4 -

Petitioner testified that, when he met with trial counsel, he told counsel to obtain medical records from the VA. Petitioner agreed that trial counsel obtained those records, plus records from "other entities that [Petitioner had] talked to outside the VA." Petitioner acknowledged that he and trial counsel discussed the contents of the records. Petitioner stated, "The medical records were received . . . but it wasn't gone over in detail [as] far as my understanding and as far as my request." Petitioner acknowledged that he reviewed discovery with trial counsel and that they listened to "part of" the 911 call. Petitioner explained that he was "not prepared to listen to the whole thing" at that time. He recalled telling co-counsel that he did not want to see any photographs contained in discovery. He said that he did not recall watching a video of the victim in the hospital.

Petitioner recalled that he underwent a mental health evaluation at Frontier Health at the request of trial counsel. He agreed that he was able to discuss his mental health issues with the evaluators but that they determined that Petitioner had "no need for additional treatment [or] additional testing" and that Petitioner was competent to consult with trial counsel. Petitioner noted that the evaluation report recommended that he receive treatment for depression, anxiety, and substance abuse.

Petitioner acknowledged that, before he entered the plea agreement, trial counsel went over the agreement with him. Trial counsel reviewed the charges against him, the sentence for each offense, and the percentage that Petitioner would serve on each offense before becoming parole eligible. Petitioner recalled that the trial court went over, in detail, his constitutional rights, and he agreed that he signed a form stating he understood his rights and was waiving his rights by entering the guilty pleas. Petitioner agreed that the trial court gave him the opportunity to ask questions during the plea colloquy but that he did not ask questions or show any concerns about the plea agreement. When asked if it was a fair statement that he understood the plea agreement at the time it was entered, Petitioner responded, "I said I did, but I did not." He explained, "[B]ascially I did it of my own free will, but I felt that, like I said, if I had not taken the plea, if I took it to trial, I did not have adequate representation to defend me[.]" He said that he did not express these concerns to the trial court at the time of the guilty plea because he was under "severe anxiety."

Trial counsel testified that he had seventeen years' experience in the practice of law. He explained that he began representing Petitioner in April 2016, after being retained by Petitioner. Trial counsel stated that he represented Petitioner for ten months—until his guilty plea on February 8, 2017—and that he met with Petitioner at the jail numerous times. Trial counsel testified that, each time he received a letter from Petitioner, he would go to the jail "and talk to [Petitioner] about whatever he had said in the letter[.]" Trial counsel said that it was "more productive" to visit Petitioner at the jail and address his concerns in person rather than responding in writing.

Trial counsel stated that Petitioner always appeared to understand their discussions. He said that Petitioner "was always very inquisitive. He asked lots of questions." Counsel continued, "[Petitioner] was emotionally tied to this at times, and that . . . was my main reason for asking for a mental evaluation and . . . because he'd told me he had a past history." Trial counsel explained that Petitioner would cry at times when talking about what happened on the date of the offenses. Counsel explained that, based on his conversations with Petitioner and Petitioner's affect at times in jail, he requested a mental health evaluation for Petitioner, which the trial court granted.

Trial counsel said that Petitioner "steadfastly refuse[d]" to testify if the case went to trial and that Petitioner did not want to dispute what the victim said about the situation. Trial counsel testified, "I explained to him it was his absolute right that he didn't have to testify, but absent his testimony as to something else happening, the jury was simply going to be left with his wife's testimony that he had held her hostage all day and shot her." Trial counsel recalled that he filed a motion to dismiss due to a defect in the indictment but that the State obtained a superseding indictment over counsel's objection. Trial counsel said that Petitioner felt that he should have been charged with aggravated assault rather than attempted first degree murder because he shot the victim below the waist. Trial counsel testified that he investigated every concern raised by Petitioner.

Trial counsel testified that he talked with Petitioner about Petitioner's medical conditions, military service, mental health issues, and past alcohol and drug addiction. Trial counsel said that he obtained Petitioner's medical records from the VA and that co-counsel went over the medical records and summarized them for trial counsel. Trial counsel said that he and co-counsel thoroughly investigated Petitioner's medical conditions to determine if there was anything they could use in Petitioner's defense. He stated that he saw no evidence of Petitioner having a "diminished ability to think" during his representation of Petitioner.

Regarding the plea agreement, trial counsel recalled that he met with Petitioner "either on the day before his plea was entered or the morning of[.]" He went over the plea form, judgments, and a "Waiver of Rights" form with Petitioner. Trial counsel explained each of Petitioner's charges, the offense class, and potential punishment Petitioner faced, and co-counsel created a graph of the plea offer for Petitioner. Trial counsel explained to Petitioner that, if he were convicted after a trial, the trial court could find that Petitioner was a dangerous offender and impose consecutive sentencing on this basis. Trial counsel stated that he had "a clear memory of . . . spending a lot of time with [Petitioner] going over the plea forms." He said that it was "obvious" that Petitioner "had a very clear grasp of what was going on." Trial counsel explained that Petitioner had an "above-adequate level of intelligence" and a college education. Counsel stated that Petitioner entered the

plea about a week before the trial was scheduled to begin. He testified that neither he nor co-counsel pressured Petitioner to enter the plea agreement.

Co-counsel testified that she was employed by trial counsel beginning in January 2017 and worked on Petitioner's case with trial counsel until Petitioner's guilty plea in February 2017. Co-counsel testified that she was with trial counsel when he met with Petitioner at the jail on January 10, 2017; January 27, 2017; February 1, 2017; February 7, 2017; and February 8, 2017. She recalled that she brought her laptop to the jail so that she could listen to the 911 call with Petitioner. She stated that Petitioner refused to look at photographs and that he did not want to watch the video of his police interview. On her January 27th visit, they watched the video of the victim's interview at the hospital, and co-counsel reviewed the photographs with Petitioner. Co-counsel said that she wanted Petitioner to see the strength of the State's case against him so that he could make an informed decision regarding any potential plea offers.

Co-counsel testified that she met with Petitioner at the jail on several occasions without trial counsel. During these meetings, co-counsel went over the elements of each of the charged offenses "to show him what could be used to convict him even on the lesser offenses." She said that, in her discussions with Petitioner, she had no reason to question Petitioner's mental capabilities or his level of understanding. Co-counsel recalled that she went with trial counsel to the jail to discuss the plea offer with Petitioner. She said that, during their discussions, Petitioner "always seemed to understand."

On cross-examination, co-counsel agreed that Petitioner's medical records showed he had been diagnosed with major depressive disorder, polysubstance abuse disorder, and ADD. She noted that Petitioner was found competent to stand trial but that the evaluation report suggested that he have "follow-up mental health and substance abuse treatment." Co-counsel stated that she did not know what kind of treatment Petitioner received in jail. Co-counsel testified that, based on her interactions with Petitioner, she believed that he understood "everything that was going on." She further stated that Petitioner never appeared to be under the influence during the jail visits.

Co-counsel testified that she reviewed over 400 pages of medical records from the VA, Blue Ridge Family Practice, and Frontier Health. She reviewed the records to try to confirm any documentation that Petitioner was diagnosed with bipolar disorder or post-traumatic stress disorder (PTSD). However, she could not find any such diagnosis; she saw only "self-reported" claims. She stated that, although Petitioner had been assessed for PTSD multiple times, he had never been diagnosed as having the disorder.

Following the hearing, the post-conviction court entered a written order denying relief. This timely appeal follows.

## II. Analysis

Petitioner asserts that his guilty pleas were not knowingly, intelligently, and voluntarily entered because, (1) although intelligent, Petitioner was under severe mental distress and suffered with mental health and substance abuse issues and had lost all hope that trial counsel was willing and able to adequately represent him at trial; (2) he was "wholly unfamiliar" with criminal proceedings; (3) trial counsel did not adequately explore Petitioner's mental health concerns; (4) Petitioner did not understand the consequences of his guilty pleas or the trial court's advice during the plea colloquy because of his severe mental distress and hopelessness at the time of the entry of his guilty pleas; and (5) Petitioner felt that he had no choice but to plead guilty due to his hopelessness and diminished confidence in counsel.

Whether a guilty plea is knowing and voluntary is a mixed question of law and fact. *Jaco v. State*, 120 S.W.3d at 828, 830-31 (Tenn. 2003). Therefore, in such cases we review the post-conviction court's findings of fact de novo with a presumption of correctness. *Id.* The post-conviction court's findings of law are reviewed purely de novo. *Id.*

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard as announced in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), *superseded on other grounds by* Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). *Don Allen Rodgers v. State*, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *5 (Tenn. Crim. App. Apr. 26, 2012). Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." *Boykin*, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e.[,] that he has been made aware of the significant consequences of such a plea . . . ." *Mackey*, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin*, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him;

the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship*, 858 S.W.2d at 904; *Howell v. State*, 185 S.W.3d 319, 330-31 (Tenn. 2006).

Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. *Boykin*, 395 U.S. at 244. Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).

In denying relief, the post-conviction court found that Petitioner's guilty pleas were knowingly, intelligently, and voluntarily entered. The post-conviction court accredited the testimony of both trial counsel and co-counsel that Petitioner understood the nature of the charges against him and the nature and consequences of his guilty pleas. The court found that Petitioner was "a college[-]educated individual, had competent, experienced counsel . . . and was able to confer with them about his case and his alternatives." Additionally, the post-conviction court found that, during the plea colloquy, Petitioner "clearly indicated that he committed the offenses to which he pled and that he understood the proceedings." The post-conviction court found that trial counsel and co-counsel adequately investigated Petitioner's mental health history and treatment and took "all appropriate measures to have his competency determined" prior to entry of the plea agreement. The court concluded that Petitioner's mental health evaluation did not support a claim of diminished capacity or mental disease or defect, that evaluators concluded Petitioner was competent to stand trial, and that Petitioner "failed to present any evidence from a mental health professional or mental health records to substantiate that he was either suffering a mental disease or defect or suffered from any psychological deficiency that made his plea invalid."

The record fully supports the post-conviction court's finding that Petitioner's guilty pleas were knowing and voluntary. Both trial counsel and co-counsel testified that they were aware of Petitioner's mental health issues. Trial counsel obtained Petitioner's medical records from the VA, Frontier Health, and Blue Ridge Family Medicine, and co-counsel went over the medical records and summarized them for trial counsel. Trial counsel said that he and co-counsel thoroughly investigated Petitioner's medical conditions to determine if there was anything they could use in Petitioner's defense. Additionally, trial counsel requested that Petitioner undergo a mental health evaluation, and Petitioner was found to be competent.

Trial counsel testified that Petitioner had an above-average level of intelligence, was college-educated, and discussed his case intelligently. Trial counsel stated that it was obvious that Petitioner had a "very clear grasp" of what was going on. Co-counsel, likewise, testified that, in her discussions with Petitioner, she had no reason to question Petitioner's mental capabilities or his level of understanding.

Trial counsel testified that he thoroughly explained the plea offer to Petitioner and went over the plea form, judgments, and "Waiver of Rights" form with Petitioner. Trial counsel explained each of Petitioner's charges, the offense class, and potential punishment Petitioner faced, and co-counsel created a graph of the plea offer for Petitioner. The record reflects that the trial court had conducted a thorough plea colloquy with Petitioner. Petitioner said that he understood the rights he was waiving and that he understood the terms of his plea agreement and the sentences he would receive, and Petitioner repeatedly said that he had no questions about his plea agreement.

Under these circumstances, Petitioner's testimony at the post-conviction hearing that he did not understand the plea agreement, by itself, does not overcome the "formidable barrier" created by Petitioner's statements at the guilty plea submission hearing. *Id.* We conclude that the post-conviction court properly determined that Petitioner's guilty pleas were knowing and voluntary and that Petitioner is not entitled to relief.

### III. Conclusion

Based on the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE